UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK
_____

DIANA E. STAGNITTA,

         Plaintiff,

   -vs-

CAROLYN W. COLVIN,
ACTING COMMISSIONER OF
SOCIAL SECURITY

         Defendant.
_____

**DECISION AND ORDER**
**No. 13-CV-6028(MAT)**

## INTRODUCTION

Plaintiff, Diana E. Stagnitta ("Plaintiff" or "Stagnitta"), brings this action pursuant to 42 U.S.C. § 405(g) of the Social Security Act, claiming that the Commissioner of Social Security ("Commissioner" or "Defendant") improperly denied her application for Disability Insurance Benefits ("DIB").

Currently before the Court are the parties' competing motions for judgment on the pleadings pursuant to Rule 12(c) of the Federal Rules of Civil Procedure. For the reasons set forth below, I grant the Commissioner's motion, deny the Plaintiff's cross-motion, and dismiss the Complaint.

## PROCEDURAL HISTORY

On January 27, 2010, Plaintiff filed an application for DIB, alleging disability as of March 2, 1985 (which was later amended to December 31, 2002 and then May 31, 2008), which was denied. Administrative Transcript [T.] 37, 63-64, 98-100, 126, 129. On July 1, 2011, an administrative hearing was conducted before

administrative law judge ("ALJ") Ramon E. Quinones, at which Plaintiff, who was represented by counsel, testified. T. 34-54. On July 22, 2011, the ALJ issued a decision finding that Plaintiff was not disabled from December 31, 2002 through July 22, 2011. T. 20-33.

The Appeals Councils denied Plaintiff's request for review, making the ALJ's Decision the final decision of the Commissioner. T. 1-6. This action followed.

## FACTUAL BACKGROUND

### Plaintiff's Mental Health History

Plaintiff treated with psychiatrist Tulio R. Ortego, M.D. from approximately 2003 to 2011. T. 359-366, 369-380. Treatment notes from 2004 show that Plaintiff was taking Lithium, Seroquel, Zoloft, Protonix, and Synthroid, and that she was mildly depressed due to postpartum stress. T. 369-380. Dr. Ortego's treatment notes from November 2005, May 2006, and November 2007 show no evidence of psychosis. T. 370-374.

In September 2008, Plaintiff met with Dr. Ortego, who noted that Plaintiff's motor activity was decreased, her speech was spontaneous and she was talkative, although her thought processes remained organized, her content was goal-directed, her mood was full range, her affect was congruent, and her insight, judgment and concentration were fair. T. 368. Dr. Ortego noted that Plaintiff was doing well and prescribed her Lithium and Zoloft. T. 368.

In December 2008, Plaintiff met with Dr. Ortego to discuss her concerns that her Lithium medication may be having an effect on her physical health.   T. 367.   Dr. Ortego continued Plaintiff's prescription of Zoloft, decreased her supply of Lithium and prescribed Depakote.  He noted that Plaintiff was doing well and she showed no acute signs or symptoms of mania, depression or psychosis.  T. 367.

Plaintiff continued to see Dr. Ortego throughout 2009, and his clinical findings remained fairly consistent and the same as prior visits.  T. 359-366.

In May 2010, Dr. Ortega completed a treatment summary report in which he identified Plaintiff's treating diagnosis as bipolar disorder, manic with psychosis.   T. 313, 356.   He noted that Plaintiff's symptoms included mood swings, poor impulse control, delusional thinking, poor sleep, racing thoughts and pressured speech, poor insight and increased aggressiveness.  T. 356.  He noted that Plaintiff was doing well on the medications he had prescribed for her and assessed her prognosis as fair to poor with treatment and medication.   T. 314.   Dr. Ortego opined that Plaintiff was "unable to work" and checked boxes on a form indicating that Plaintiff was limited in sustaining concentration and persistence, social interaction, and adaptation.  T. 318.

Plaintiff met with Dr. Ortego in June and July 2010, and Dr. Ortego noted that Plaintiff had no gross symptoms or signs, but was mildly labile.  T. 354-355.  Plaintiff also met with Dr. Ortego

in April 2011, at which time Plaintiff was preoccupied with the death of a relative.  T. 352.  Plaintiff also met with Dr. Ortego in May of 2011, at which time she indicated she was feeling alright and denied any acute signs, symptoms, mania or mood swings. T. 350.  Dr. Ortego prescribed Seroquel, Zoloft, and Lithium and noted that Plaintiff's affect was full, that she demonstrated good range of emotion, and had no problems expressing herself.  T. 350.

**Plaintiff's Physical Health History**

In March 2008, Anthony Ragusa, M.D., internal medicine, began treating Plaintiff at Greater Rochester Internal Medicine.  His initial assessment was hypothyroidism, obesity, bipolar disorder, and gastroesophageal reflux disease.  T. 212.

In April 2008, Plaintiff underwent a thyroid ultrasound which showed a complex cyst in her left thyroid lobe and was otherwise normal.  T. 231.

In October 2008, Dr. Ragusa referred Plaintiff to Krishnajua Rajamani, M.D. for further assessment of Plaintiff's thyroid abnormality and for her complaints of fatigue and voice hoarseness. T. 242-243.  Plaintiff underwent a parathyroid scan, which was positive for a functioning parathyroid nodule in the left lobe. T. 235.

In November 2008, after complaining to Dr. Ragusa of low back and right leg pain, she underwent imaging of her lumbosacral spine

and right leg.    The test of her spine revealed mild disc degeneration, and the right leg test was normal.  T. 236-237.

In February 2009, Dr. Rajamani confirmed a diagnosis of primary hyperparathyroidism in a report to Dr. Ragusa based on lab results of elevated parathyroid hormone level, mildly elevated TSH levels, and the results of the parathyroid scan.  T. 244.

In June 2009, Dr. Rajamani ordered a neck ultrasound, which showed that the thyroid was unremarkable.   An ultrasound guided fine needed aspiration, however, showed a left-sided nodule. T. 239, 240.  Dr. Rajamani referred Plaintiff to Nagendra Nadaraja, M.D. for further assessment of Plaintiff's thyroid condition. T. 247, 303.

In September 2009, Dr. Nadaraja performed an exploration of the neck and a parathyroidectomy and found no identifiable issues. T. 205-207, 339-342.    Dr. Nadaraja referred Plaintiff to an otolaryngologist for Plaintiff's continued complaints of hoarseness.  T. 249.  On October 26, 2009, Plaintiff saw Michael Haben, M.D. who noted evidence of left-sided recurrent laryngeal nerve neuropraxis causing voice deficits, but noted that Plaintiff should recover.  T. 250-251.  Also in October, Plaintiff met with Dr. Rajamani, who reported that Plaintiff's voice had improved, she had no difficulty breathing, her lab results were normal, and that her hypercalcemia had resolved following the parathyroidectomy. T. 254.

In December 2009, Plaintiff saw John U. Coniglio, M.D. at the Head and Neck Center in Rochester, New York.  T. 255-259, 325-328. Dr. Coniglio performed a vocal fold injection, and, at a follow-up in January 2010, Plaintiff reported no voice complaints.  T. 259. At a subsequent follow-up in April 2010, Dr. Coniglio reported that Plaintiff's voice was good and there was good compensation of the vocal fold.  T. 344.  In May 2010, Dr. Coniglio completed a treatment summary report, in which he reported a diagnosis for Plaintiff of left vocal cord palsy with slight voice impairment, and checked a box indicating that there were no other conditions significant to Plaintiff's recovery.  T. 323.

From December 2009 to March 2010, Plaintiff met with Dr. Rajamani, and reports from that period show that Plaintiff was doing well, her voice had recovered, she was alert and oriented and she had no signs of dizziness or emotional disturbances, and her hypothyroidism was stable.  T. 193, 196.  During this same time period, Plaintiff also met with Dr. Nadaraja.  T. 337-338.  By mid-December 2010, Plaintiff reported that her voice was stronger, and by February 2010, Plaintiff's voice was almost back to normal. T. 335.

In March 2010, upon the Agency's request, Dr. Nadaraja completed a functional limitation assessment form, but was unable to establish if Plaintiff had any limitations to perform work-related activities.  T. 198-207.

In August 2010, Dr. Rajamani reported that Plaintiff was feeling well, her voice had improved and there were no nodules palpable in the neck.   T. 347.   In August and again in November 2010 and February 2011, Dr. Rajamani noted that Plaintiff's lab results were normal, except for elevated parathyroid hormone level, which he opined could possibly be due to her Lithium medication. T. 345-347.

In October 2010, Dr. Coniglio performed a videostroboscopy of Plaintiff's neck and concluded that no further injections were needed since the left recurrent laryngeal nerve was reinnervating. T. 343.

**Consultative Examinations**

In April 2010, Kavitha Finnity, Ph.D. performed a consultative examination of Plaintiff.   T. 262-266.   Dr. Finnity noted that Plaintiff reported having been hospitalized for psychiatric treatment in the past.   T. 262.   Upon examination, Dr. Finnity assessed that Plaintiff could follow and understand simple directions and instructions and perform simple tasks, and could maintain attention, concentration and a work schedule.   T. 262. She also opined that Plaintiff could learn new tasks and perform complex tasks, and make appropriate decisions.   Dr. Finnity opined that Plaintiff had some difficulty relating to others and dealing with stress.   She assessed bipolar disorder.   T. 264.

Also in April 2010, Z. Matta, M.D. performed a consultative review of the medical evidence in the record.   T. 267-284.

Dr. Matta completed a Psychiatric Review Technique Form, and assessed Plaintiff's mental status. T. 267. Dr. Matta assessed that Plaintiff was mildly limited in performing activities of daily living and maintaining concentration, persistence or pace, was moderately limited in social functioning, and had not experienced repeated episodes of deterioration, each of extended duration. T. 277. Dr. Matta found that Plaintiff was not significantly limited in any of the mental activities related to understanding and memory, sustained concentration and persistence, social interaction and adaption. T. 281-282. Dr. Matta opined that Plaintiff appeared capable of performing all tasks necessary for vocational functioning. T. 283.

**Plaintiff's Testimony**

Plaintiff testified that she was born in 1958, and attended two years of college. T. 98, 129, 174, 28, 134. She previously worked as a part-time daycare worker and also worked "off the books" for her husband's cabinet-making business assisting with bookkeeping, bill collecting and paying bills. T. 28-39. Plaintiff testified that she did not have any difficulties working outside her home, but that she liked being home more. T. 40. She testified that she was a shy person, and was fine when she went outside of her home except that she would get nervous. T. 40.

Plaintiff testified that she currently saw Dr. Ortego for medication management and treatment of her bipolar disorder. She testified that prior to seeing Dr. Ortego, she had treated with

Dr. Geral Gruma for her bipolar disorder. T. 40-41, 49-51. She testified further that, at times, she would get "real hyper" and talk to much and be on a "big high." T. 41. She also testified that her bipolar condition causes her fatigue during the daytime, and therefore lays down daily. T. 46-47. She claimed that when she lost her voice for several months in 2009, she was in a manic state. T. 44-45. According to her, her bipolar symptoms subsided when she was prescribed the medication Seroquel. T. 43-44. She also stated that since she had started taking Seroquel, her moods were stable. T. 42. When asked by the ALJ the last time she experienced depression, Plaintiff stated that she could not remember. T. 42.

Plaintiff testified that she did not believe she could work full time because she could not balance her home life with her work life. T. 43. She testified that she could do the work she did for her husband's business anytime during the day despite her habit of sleeping. T. 46-48.

Plaintiff testified that "the meds" she takes limit her ability to work on a full-time basis. T. 48. She explained that she sometimes takes a sleeping pill when she cannot sleep, and, if she takes the sleeping pill too late, she is "out of it" in the morning. T. 48.

Plaintiff testified that she lived with her husband and two of her three sons. T. 50. Plaintiff has a driver's license and drives. T. 52.

## DISCUSSION

## I. Jurisdiction and Scope of Review

42 U.S.C. § 405(g) grants jurisdiction to district courts to hear claims based on the denial of Social Security benefits. Section 405 (g) provides that the District Court "shall have the power to enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the Commissioner of Social Security, with or without remanding the cause for a rehearing." 42 U.S.C. § 405(g)(2007). The section directs that when considering such a claim, the Court must accept the findings of fact made by the Commissioner, provided that such findings are supported by substantial evidence in the record. Substantial evidence is defined as "'more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" Richardson v. Perales, 402 U.S. 389, 401 (1971) (quoting Consolidated Edison Co. v. NLRB, 305 U.S. 197, 229 (1938)); see also Metropolitan Stevedore Co. v. Rambo, 521 U.S. 121, 149 (1997).

When determining whether the Commissioner's findings are supported by substantial evidence, the Court's task is "to examine the entire record, including contradictory evidence and evidence from which conflicting inferences can be drawn." Brown v. Apfel, 174 F.3d 59, 62 (2d Cir. 1999) (quoting Mongeur v. Heckler, 722 F.2d 1033, 1038 (2d Cir. 1983) (per curiam)). Section 405 (g) limits the scope of the Court's review to two inquiries:

determining whether the Commissioner's findings were supported by substantial evidence in the record as a whole, and whether the Commissioner's conclusions are based upon an erroneous legal standard. Green-Younger v. Barnhart, 335 F.3d 99, 105-06 (2d Cir. 2003); see also Mongeur, 722 F.2d at 1038 (finding a reviewing court does not try a benefits case de novo).

Under Rule 12(c), judgment on the pleadings may be granted where the material facts are undisputed and where judgment on the merits is possible merely by considering the contents of the pleadings. Sellers v. M.C. Floor Crafters, Inc., 842 F.2d 639, 642 (2d Cir. 1988).  A party's motion will be dismissed if, after a review of the pleadings, the Court is convinced that the party does not set out factual allegations that are "enough to raise a right to relief beyond the speculative level." Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 570 (2007).

## II.  The Commissioner's Decision Denying Plaintiff Benefits is Supported by Substantial Evidence in the Record

The Social Security Administration has promulgated a five-step sequential analysis that the ALJ must adhere to for evaluating disability claims.  20 C.F.R. § 404.1520.  Pursuant to this inquiry:

> First, the Commissioner considers whether the claimant is currently engaged in substantial gainful activity. If he is not, the Commissioner considers whether the claimant has a "severe impairment" which significantly limits his ability to do basic work activity. If the claimant has such an impairment, the Commissioner considers whether, based solely on medical evidence, the claimant has an

> impairment which is listed in Appendix 1,
> Part 404, Subpart P. If the claimant does not
> have a listed impairment, the Commissioner
> inquires whether, despite the claimant's
> impairment, he has the residual functional
> capacity to perform his past work. If he is
> unable to perform his past work, the
> Commissioner determines whether there is other
> work which the claimant can perform.

Berry v. Schweiker, 675 F.2d 464, 466-67 (2d Cir. 1982).

The ALJ in this case used this sequential procedure to determine Plaintiff's eligibility for disability benefits. The ALJ first found that Plaintiff did not engage in substantial gainful activity since December 31, 2002, the alleged onset date. Next, the ALJ found that Plaintiff had the medically determinable impairment of depressive disorder, but that Plaintiff did not have an impairment or combination of impairments that has significantly limited her ability to perform basic work-related activities for 12 consecutive months and therefore Plaintiff does not have a severe impairment or combination of impairments. T. 25-28. Therefore, the ALJ ended his analysis and concluded that Plaintiff had not been disabled, as defined in the Act, during the relevant time period. T. 30

In the instant proceeding, Plaintiff argues that: (1) the ALJ erred in failing to recognize or evaluate Plaintiff's multiple medically determinable impairments; and (2) the ALJ erred in his assertion that Plaintiff's mental disorder was not a severe impairment. Pl's Mem. of Law (Dkt. No. 8) at Points I-II. The Commissioner asserts that the decision of the ALJ is not erroneous

as a matter of law and is supported by substantial evidence. Def's
Mem. of Law (Dkt. No. 6-1).

### A.   The ALJ Properly Assessed Plaintiff's Impairments

Plaintiff first contends that the ALJ erred in failing to
recognize or evaluate her "multiple medically determinable
impairments," namely her hyperparathyroidism, her bipolar disorder,
and her degenerative disc/joint disease in her low back.   Dkt.
No. 8 at 6-9.

At step two of the sequential evaluation process, an ALJ must
determine if a claimant has a medically determinable impairment and
whether that impairment is "severe" such that it significantly
limits the claimant's physical or mental ability to do basic work
activities.   An impairment is "not severe" when medical and other
evidence establish a slight abnormality or a combination of slight
abnormalities that would have no more than a minimal effect on an
individual's ability to work.   See 20 C.F.R. § 416.921(a); Social
Security Ruling ("SSR") 96-3p, 1996 SSR LEXIS 10 at *3, 1996 WL
374181, at *1 (July 2, 1996).

In this case, the ALJ determined that Plaintiff had the
medically determinable impairment of depressive disorder.   T. 25.
Although Plaintiff did not expressly allege disability based on
such an impairment, the ALJ appears to have made this finding based
on the evidence in the record related to Plaintiff's bipolar

condition and her related mental health treatment with Dr. Ortego since 2003.

As Plaintiff correctly points, the ALJ made no explicit finding whether Plaintiff's thyroid condition, her bipolar disorder, and her degenerative disc/joint disease in her low back were medically determinable impairments in his decision before he concluded that "[Plaintiff] does not have an impairment or combination of impairments that has significantly limited . . . the ability to perform basic work-related activities for 12 months; therefore, the [Plaintiff] does not have a severe impairment or combination of impairments." T. 25. Despite the ALJ's failure to expressly make such a "threshold" finding, he did engage in a lengthy, detailed discussion of Plaintiff's mental and physical health history –- including Plaintiff's thyroid condition and her bipolar disorder -- and compared same to Plaintiff's symptoms. T. 25-28.

With respect to Plaintiff's thyroid condition, the ALJ acknowledged that Plaintiff had suffered from hyperparathyroidism since 2008, and that she underwent thyroid surgery in 2009. T. 27-28. However, the ALJ also noted that the surgery she received with respect thereto was "generally successful" in relieving her symptoms. He pointed out that progress notes from Dr. Nadajara post-thyroid surgery show that Plaintiff was feeling well and looked well, her voice was stronger, and that her hypothyroidism stabilized. T. 27-28, 335-338. Further, the ALJ pointed out that,

-14-

on a standard assessment form dated March 2010, Dr. Nadajara indicated that she could not provide a medical opinion regarding Plaintiff's ability to do work-related activities.  T. 28, 203. The ALJ also took into account that Dr. John Coniglio, who evaluated Plaintiff post-surgery in April 2010 and completed a Medical Source Statement in May 2010, reported no complications or limitations from the thyroid surgery except for "some mild/slight dysphonia."  T. 28, 230-232, 344.  Further, the ALJ noted that Plaintiff's primary care physician, Dr. Anthony Ragusa, could not establish any limitation in regard to Plaintiff's ability to perform work.  T. 28, 208-261.  Thus, the ALJ properly evaluated Plaintiff's thyroid condition, and determined that it was not severe.

Similarly, the ALJ also discussed Plaintiff's mental health, including her bipolar disorder, and acknowledged that Plaintiff received mental health treatment from Dr. Ortego since 2003. Because the ALJ determined that Plaintiff suffered from a medically determinable mental impairment, he properly employed the "special technique," pursuant to 20 C.F.R. § 404.1520a, to evaluate the severity of Plaintiff's mental impairment.

Pursuant to the "special technique," once an ALJ identifies a mental impairment, the ALJ must then "rate the degree of functional limitation resulting from the impairment(s)" according to four broad functional areas: (1) activities of daily living; (2) social functioning; (3) concentration, persistence, or pace; and

(4) episodes of decompensation. Id. at § 404.1520a(c)(3); see also Kohler v. Astrue, 546 F.3d 260, 265-66 (2d Cir. 2008). If the ALJ finds the degree of limitation in each of the first three areas as "mild" or better, and the hearing officer is unable to identify any episodes of decompensation, then the hearing officer generally should conclude that the claimant's mental impairment is not severe. 20 C.F.R. § 404.1520a(d)(1).

Here, the ALJ complied with the "special technique" and assessed Plaintiff's mental impairment in the four functional areas. With respect to the first area of activities of daily living, the ALJ noted that Plaintiff reported being able to cook, clean, do laundry and go shopping, and that she was able to take care of her own personal hygiene, listen to music and to read. T. 29, 163-173, 264.

With respect to social functioning, the ALJ noted that Plaintiff reported being to able to drive, go to the store alone, that she had friends, and enjoyed socializing. T. 29, 264. The ALJ also pointed out that Plaintiff had "no difficulty relating to the medical examiners," (T. 29) as evidenced by the opinion of consultative psychiatric examiner Dr. Finnity who reported that Plaintiff's "manner of relating was adequate." T. 264. In conducting her mental status examination, Dr. Finnity also noted that Plaintiff's "eye contact was normal," her "speech was fluent," her thought processes were "coherent and goal directed," her affect was "of full range and appropriate to speech and thought content,"

her mood was "neutral," her sensorium was "clear," she was oriented, her attention was intact, her recent and remote memory skills were intact, her cognitive functioning was "average," and her insight and judgment were fair. T. 29, 263-264. Additionally, the ALJ noted that Plaintiff had no difficulty relating to him during the Administrative hearing. T. 29.

Accordingly, the ALJ determined that Plaintiff had "no limitation" with respect to the first two areas of functioning.

With respect to concentration, persistence or pace, the ALJ noted the multiple activities of daily living that Plaintiff stated she was able to do. T. 163-173, 264. The ALJ pointed out that, although Plaintiff alleged having some difficulties, she "followed well and meaningfully participated in the [administrative] hearing." T. 29. The ALJ also pointed out that she was the sole provider of information at her consultative evaluations and followed all the instructions given to her. T. 29, 263-264, 277. Additionally, he noted Plaintiff's ability to do crossword puzzles and play scrabble, two activities that require "great memory skills." T. 29, 264. Accordingly, he found "mild limitations" in this areas.

With respect to the fourth area of functioning, the Social Security regulations define an episode of "decompensation" as an "exacerbation[] or temporary increase[] in symptoms or signs accompanied by a loss of adaptive functioning." 20 C.F.R. Pt.

§ 404.1520a, App. at § 12.00C(4).  "The term repeated episodes of decompensation, each of extended duration," as evaluated for the fourth functional area of the "special technique," means three episodes of decompensation within one year, "each lasting for at least [two] weeks."  Id.  As noted by the ALJ, the record was devoid of evidence showing significant alteration in Plaintiff's medication or the need for a more structured psychological support system.  T. 29.  Plaintiff now claims that the ALJ failed to take into consideration her "history of psychiatric hospitalizations" in arriving at his determination in this area.  Dkt. No. 8 at 14.  However, the record reflects that, during the relevant time period, Plaintiff was only hospitalized once in 2003 for 11 days for her bipolar disorder.  T. 386-392.  Moreover, it was noted at that time that Plaintiff "functioned quite well," and that it was "on rare occasion" that Plaintiff became "hypomaniac and medication non-compliant."  T. 387.  Further, the attending physician at Rochester General Hospital at that time, noted that "soon into her hospital stay, [Plaintiff] re-equilibrated in a reasonably rapid time" and "appeared to have returned to her baseline status."  T. 387.  Further, the attending physician noted that Plaintiff "left the hospital in significantly improved status on a regimen of" various medications.  T. 388.  And, for the time period relevant to this action, the record contains no additional hospitalizations and/or reports of suddenly increased symptoms.  T. 388.  Accordingly, the

ALJ correctly determined that Plaintiff had experienced "no episodes of decompensation, which have been of extended duration" within the meaning of the Regulations.

Because the ALJ assessed the degree of limitation in each of the first three areas as "mild" or better, and he was unable to identify any episodes of decompensation, which have been of extended duration, he properly concluded that Plaintiff's mental impairment was not severe. 20 C.F.R. § 404.1520a(d)(1).

Finally, with respect to Plaintiff's degenerative disc/joint disease in her low back, Plaintiff faults the ALJ for failing to address this impairment altogether in his decision.  Indeed, the ALJ made not mention of this alleged impairment whatsoever in his decision.  However, a review of the record reflects that this alleged impairment is only present in the form of one diagnostic test performed in 2008 on Plaintiff's spine, which resulted in some mild findings but was otherwise unremarkable.  T. 236-237. Further, the record is devoid of evidence suggesting any limitation resulted from an impairment related to Plaintiff's low back.  Thus, the ALJ properly evaluated the evidence in the record with respect to this particular alleged impairment.

Accordingly, the Court finds that the ALJ's assessment of the impairments in the record and his related severity determination at Step 2 of the analysis is supported by substantial evidence in the record.

**B.    The ALJ Properly Weighed the Opinions in the Record**

Next, Plaintiff argues that, in arriving at his determination that her mental impairment was not severe, the ALJ failed to give controlling evidentiary weight to treating psychiatrist Dr. Ortego's medical opinion, or to explain why he did not do so. Dkt. No. 8 at 11-13.

Indeed, as Plaintiff points out, the law gives "special evidentiary weight" to the opinion of a treating physician. Clark v. Comm'r of Soc. Sec., 143 F.3d 115, 118 (2d Cir. 1998) (discussing 20 C.F.R. §§ 404.1527(d)(2), 416.927(d)(2)). Specifically, if the ALJ finds that "a treating source's opinion on the issue(s) of the nature and severity of [Plaintiff's] impairment(s) is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the] case record," the opinion has controlling weight. 20 C.F.R. §§ 404.1527(d)(2), 416.927(d)(2). If a treating physician's opinion is not given controlling weight, the ALJ must apply the following factors: "(i) the frequency of examination and the length, nature, and extent of the treatment relationship; (ii) the evidence in support of the opinion; (iii) the opinion's consistency with the record as a whole; (iv) whether the opinion is from a specialist; and (v) other relevant factors." Schaal v. Apfel, 134 F.3d 496, 503 (2d Cir. 1998); 20 C.F.R. § 404.1527(d).

Here, contrary to Plaintiff's contentions, the ALJ complied with these principles and properly afforded Dr. Ortego's statements "little weight" because they were inconsistent in certain respects with his own progress notes. T. 28. Specifically, the ALJ pointed out that Dr. Ortego's report of May 18, 2010 assessed that Plaintiff suffered from a bipolar disorder, accompanied by poor impulse control, poor sleep, mood swings, racing thoughts and increased aggressiveness. T. 28, 313. However, on page 3 of this same report, Dr. Ortego stated that Plaintiff was doing very well with treatment in that her affect, mood, attention, memory and ability to perform calculations were good. T. 316. Further, the ALJ noted that while Dr. Ortego indicated that Plaintiff had the capacity to handle her own funds, he also indicated that Plaintiff's ability to function in a work setting was "poor, unable to work." T. 28, 317. Accordingly, the Court finds that the ALJ properly evaluated the opinion of treating psychiatrist Dr. Ortego.

Plaintiff also asserts that the ALJ failed to give proper weight to the consultative examinations of Drs. Finnity and Mata. Dkt. No. 8 at 14-15. However, as set forth above, the ALJ properly took into consideration the opinions of Drs. Finnity and Mata -- to the extent their opinions were persuasive and consistent with the record as a whole -- when considering the four functional limitation areas of his severity analysis with respect to Plaintiff's mental impairment. See, e.g., Veino v. Barnhart, 312

-21-

F.3d 578, 588 (2d Cir. 2002) ("Genuine conflicts in the medical evidence are for the Commissioner to resolve.") (citing <u>Richardson v. Perales</u>, 402 U.S. 389, 399 (1971)); <u>Schaal</u>, 134 F.3d at 504 ("It is for the SSA, and not this court, to weigh the conflicting evidence in the record.").

Moreover, there is no merit to Plaintiff's particular argument that the ALJ failed to give proper consideration to the opinion of Dr. Mata who opined that Plaintiff's mental impairment caused moderate limitations in social functioning and mild limitations in performing activities of daily living, and maintaining concentration, persistence or pace. Dkt. No. 8 at 14-15. In this case, the ALJ properly discounted Dr. Mata's assessment of Plaintiff's functional mental limitations based on its nature as a form report (i.e., a form with checked boxes) unaccompanied by any explanation or detail regarding her conclusion. T. 277. <u>See, e.g.</u>, <u>Mason v. Shalala</u>, 994 F.2d 1058, 1065 (3d Cir. 1993) (terming form reports "weak evidence at best"); <u>Crane v. Shalala</u>, 76 F.3d 251, 253 (9th Cir. 1996) (holding that the ALJ "permissibly rejected" three psychological evaluations "because they were check-off reports that did not contain any explanation of the bases of their conclusions"); <u>O'Leary v. Schweiker</u>, 710 F.2d 1334, 1341 (8th Cir. 1983) ("[W]hile these forms are admissible, they are entitled to little weight and do not constitute 'substantial evidence' on the record as a whole.").

-22-

Therefore, I find that the ALJ appropriately considered the medical opinions in the record and his decision in which he finds the Plaintiff was not disabled from December 31, 2010 to July 22, 2011 is supported by substantial evidence in the record.

## CONCLUSION

The Commissioner's Motion for Judgment on the Pleadings is granted, the Plaintiff's cross-motion is denied, and the Complaint is dismissed in its entirety with prejudice.

**IT IS SO ORDERED.**

**S/Michael A. Telesca**

_____
HONORABLE MICHAEL A. TELESCA
United States District Judge

DATED:      April 11, 2014
            Rochester, New York